ILLINOIS CENTRAL RAILROAD COMPANY, Plaintiff,

v.

Kirk FORDICE, Governor of the State of Mississippi in His Official Capacity, et al., Defendants.

No. Civ.A.3:96–CV–486WS.

United States District Court, S.D. Mississippi, Jackson Division.

Sept. 30, 1997.

Charles T. Ozier, Wise, Carter, Child & Caraway, Jackson, MS, for Illinois Central Railroad Company, plaintiff.

Alan K. Sudduth, Brown & Watt, Pascagoula, MS, for CSX Transportation, Inc., intervenor-plaintiff.

Rickey T. Moore, Office of the Attorney General, Jackson, MS, for Kirk Fordice, Mike Moore, defendants.

Wilburn Hyche, Rainer & Hyche, Brandon, MS, for Rankin County, Mississippi, Ken Dickerson, defendants.

John G. Wheeler, William Collins Spencer, Mitchell, McNutt, Threadgill, Smith & Sams, Tupelo, MS, for Burlington Northern Railroad Company, intervenor-plaintiff.

Stuart G. Kruger, Watkins, Ludlam & Stennis, Jackson, MS, for The Kansas City Southern Railway Company, intervenor-plaintiff.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the motion of plaintiff Illinois Central Railroad Company for summary judgment against defendants filed pursuant to Rule 56(a)[1] of the Federal Rules of Civil Procedure. Burlington Northern Railroad Company, Kansas City Southern Railway Company and CSX Transportation, Inc. have intervened as plaintiffs in this action. Defendants, Kirk Fordice, as Governor of the State of Mississippi; Mike Moore, Attorney General of the State of Mississippi; Rankin County, Mississippi; and Ken Dickerson, Sheriff of Rankin County, Mississippi, have responded and filed their own motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6)[2] of the Federal Rules of Civil Procedure, or in the alternative for summary judgement pursuant to Rule 56(b)[3] of the Federal Rules of Civil Procedure.

---

1. Fed.R.Civ.P. 56(a) states: For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

2. Fed.R.Civ.P. 12(b)(6) states: How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (6) failure to state a claim upon which relief can be granted.

3. Fed.R.Civ.P. 56(b), For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without

Plaintiff, the Illinois Central Railroad Company, brings this action for declaratory and injunctive relief seeking a ruling that Mississippi's Implied Consent Law, Miss. Code Ann. § 63–11–1 et seq., does not apply to railroads and their train crews, since by its express language, Mississippi's Implied Consent Law excludes trains and covers only those motor vehicles which drive upon the public highways, public roads and streets of this state. Alternatively, plaintiff contends that even if this law covers trains and railroads, this state law is preempted by the Federal Railroad Safety Act, Title 49 U.S.C. § 20106 et seq. Defendants argue positions contrary to those of plaintiff, questioning in addition whether plaintiff has representative standing to bring this lawsuit and whether the Eleventh Amendment to the United States Constitution[4] bars this action. This court has jurisdiction over this dispute under Title 28 U.S.C. § 1331[5], as the necessary interpretation of the preemptive effect of the Federal Railroad Safety Act, Title 49 U.S.C. § 20106, is a federal question. Declaratory relief is authorized under Title 28 U.S.C. § 2201,[6] 2202[7].

Persuaded that it has jurisdiction over this law and that the plaintiff has the requisite standing to bring this lawsuit, this court holds that the prescriptions of the Federal Railroad Safety Act do not preempt the thrust of Mississippi's Implied Consent Law, but that Mississippi's Implied Consent Law does not include trains and their crews within its regulatory embrace. Therefore, as explained herein, this court, upon the undisputed material fact and applicable law, grants summary judgment to the plaintiff.

## I. Factual Background

Section 63–11–8 of the Mississippi Code Annotated provides that the operator of a motor vehicle who is involved in an accident that results in a death shall be tested for alcohol and drug content. This statute is part of Mississippi's Implied Consent Law which establishes criminal penalties for persons who operate motor vehicles while under the influence of alcohol or drugs. MissCode Ann. § 63–11–30.

On June 4, 1996, an Illinois Central train hit an automobile at a rail/highway grade crossing in Rankin County, Mississippi. The driver of the automobile was killed. The Rankin County Sheriff's Department required the members of the train crew to submit to a drug and alcohol blood test based on their interpretations of § 63–11–8 of the Mississippi Code. The train crew passed the tests so none of these individuals was determined to be in violation of the statute. Therefore, the Rankin County Sheriff's Office did not file any charges against the train crew. Had the tests shown the train crew to be in violation of the statute, the Sheriff could have charged the crew with Driving Under the Influence (DUI) under § 63–11–30 of the Mississippi Code.

On June 28, 1996, plaintiff, the employer of the train crew, filed a complaint seeking declaratory and injunctive relief asking that § 63–11–8 of the Mississippi Code Annotated be declared null and void insofar as it applies to railroads and railroad train crews. Plaintiff alleges that, insofar as § 63–11–8 applies to railroads, it is preempted by the Federal Railroad Safety Act, Title 49 U.S.C. § 20106 and the regulations promulgated pursuant thereto. Plaintiff further argues preemption

---

supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

4. U.S. Const. Amend. Eleven states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

5. Title 28 U.S.C. § 1331. Federal Question. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

6. Title 28 U.S.C. § 2201 states in pertinent part: (a) "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...."

7. Title 28 U.S.C. § 2202 states in pertinent part: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

under Title 29 C.F.R. § 219, pursuant to the Supremacy Clause, Article VI, clause 2 of the United States Constitution, and as secured by Title 42 U.S.C. § 1983. Defendants, on the other hand, contend that this action is barred by the Eleventh Amendment; that the plaintiff has no standing; and that there is no justiciable controversy. The court will examine each of the defendants' contentions before addressing the plaintiff's preemption argument.

## II. Eleventh Amendment

■ Defendants argue that this lawsuit is barred by the Eleventh Amendment to the United States Constitution.[8] According to defendants, because this action is based upon the Federal Railroad Safety Act of 1970, which is founded on the Commerce Clause of the United States Constitution, this cause of action is barred by the Eleventh Amendment to the United States Constitution pursuant to United States Supreme Court opinion in *Seminole Tribe of Florida v.. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 1123–32, 134 L.Ed.2d 252 (1996).

In *Seminole,* the United States Supreme Court held that the Eleventh Amendment prevents Congress from authorizing lawsuits by Indian tribes against States to enforce legislation enacted pursuant to the Indian Commerce Clause. In *Seminole,* the Seminole Tribe sued Florida and its Governor in federal court under the Indian Gaming Regulatory Act, passed by Congress under the auspices of the Indian Commerce Clause, allowing an Indian tribe to conduct certain gaming activities only in conformance with a valid compact between the tribe and the State in which the gaming activities are located. The defendants therein moved for dismissal of the plaintiff's complaint on the ground that the suit violated Florida's sovereign immunity from suit in federal court. In addition to holding that the Eleventh Amendment barred the suit, the United States Supreme Court additionally held that the factual circumstance here did not warrant application of the doctrine found in *Ex*

*Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which would allow a suit against a state official to go forward, notwithstanding the Eleventh Amendment's jurisdictional bar, where the suit seeks prospective injunctive relief in order to end a continuing feudal-law violation. The Court found that since Congress had prescribed a detailed remedial scheme which could address plaintiff's concerns, the precepts of *Ex Parte Young* were not available.

*Seminole* is not applicable to the lawsuit *sub judice.* Defendants have made no showing that plaintiff has available to it some alternative, detailed statutory remedial scheme created by Congress. Instead, the controversy here falls squarely within the exception to the precepts of Eleventh Amendment immunity as carved out by *Ex Parte Young.* The Fifth Circuit's opinion in *CIGNA Healthplan of Louisiana, Inc. v. State of Louisiana ex rel. Ieyoub,* 82 F.3d 642 (5th Cir.1996) appears to agree with this court's observation, where the Fifth Circuit summarily rejected an argument strikingly similar to that offered by defendants here.

In *CIGNA,* two health maintenance organizations brought suit against the Attorney General of the State of Louisiana, in his official capacity, seeking declaratory judgment that the State's "Any Willing Provider" statute was preempted by the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Attorney General argued that the Eleventh Amendment barred the lawsuit. The district court held that the argument was "patently without merit" and the Fifth Circuit agreed. *CIGNA,* 82 F.3d at 644 n. 1. The Fifth Circuit explained, stating that "it is well established that the federal courts have jurisdiction to hear suits against state officials where, as here, the plaintiffs seek only prospective declaratory or injunctive relief to prevent the continuing violation of federal law." *Id.* As for the Supreme Court's decision in *Seminole,* the Fifth Circuit went on to state:

---

8. The Eleventh Amendment to the U.S. Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Our conclusion is unaffected by the Supreme Court's recent decision in *Seminole* .... There, a sharply divided court held that suits against state officials for prospective injunctive relief are barred 'where Congress has prescribed the detailed remedial scheme for the enforcement against the state of the statutorily created right.' Here, [the health maintenance organizations] do not seek to enforce against Louisiana any cause of action created by Congress; and no Congressionally mandated remedial scheme is implicated. Instead, [they] seek only to prevent a Louisiana official from violating the Supremacy Clause of the United States Constitution by encroaching on legal terrains that Congress has properly deemed preempted. Accordingly, the Court's holding in *Seminole* does not apply to the circumstances of this case; and we affirm the district court's determination that the Eleventh Amendment does not proscribe this suit.

*CIGNA*, 82 F.3d at 644 n. 1.

Like the plaintiffs in *CIGNA*, plaintiff here seeks declaratory and injunctive relief against a state official, seeking to enjoin that official from enforcing a state statute allegedly preempted by a federal enactment. Based upon the urgings of the holding in *CIGNA*, this court is persuaded that there is no Eleventh Amendment bar to the instant action.

### III. Standing

■ A fundamental requirement of Article III of the United States Constitution is that a plaintiff must personally demonstrate standing for a cause of action for injunctive relief to stand. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). Standing is "perhaps the most important of the jurisdictional doctrines," and lower federal courts are under a special obligation to determine that standing exists. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230, 232, 110 S.Ct. 596, 608, 107 L.Ed.2d 603, 621–622 (1990). The "irreducible constitutional minimum" for standing was stated by the United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Therein, the Court stated as follows:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, (citations omitted); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" (citations omitted) Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able]" to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court..." (citation omitted). Third, it must be "likely," as opposed to merely "speculative", that the injury will be "redressed by a favorable decision." (citation omitted)

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136. See also, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

■ The burden of establishing standing falls upon the plaintiff and the necessary requirements of standing must be specifically demonstrated in the complaint. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). Indeed, the Supreme Court has stressed that standing cannot be "inferred argumentatively from the pleadings;" instead, a plaintiff must "clearly ... allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990); *Whitmore v. Arkansas*, 495 U.S. 149, 155–156, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135, 145 (1990).

■ Defendants' argument actually involves two distinct contentions, both of which attack plaintiff's standing to bring this lawsuit. First, defendants claim this court has no authority to entertain this lawsuit because plaintiff has not shown it personally has suffered some injury as a result of the alleged unconstitutional conduct of defendants. De-

fendants assert that, because of the hypothetical or conjectural nature of the matter, plaintiff cannot prove it personally is in immediate danger of sustaining some direct injury as a result of the challenged state conduct.

Plaintiff responds to this argument by pointing out the series of allegedly unlawful intrusions it has suffered, culminating in the involuntary testing and near arrest of plaintiff's train crew. Plaintiff asserts that as a direct consequence of these intrusions, it has incurred economic harm in the form of train delay, additional labor costs, additional diesel fuel expense, additional rental charges and is threatened with future economic losses, such as the loss of new or repeat business.

The court agrees with the plaintiff. The aforementioned injuries would not have been sustained by plaintiff but for the actions of the defendants. Should this court determine the state statute under which the defendants were acting is null and void, plaintiff will not be subjected to such intrusions again and, therefore, will not suffer the same economic injuries.

■ Secondly, Defendants next argue that since, by its terms, § 63–11–8 of the Mississippi Code is applicable only to individuals operating a motor vehicle and not to corporate entities such as plaintiff, plaintiff cannot satisfy the test for bringing this action in a representative capacity. This court is not persuaded.

The United States Supreme Court set forth the test for representational standing in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), as follows:

(1) the members of the association must have standing individually;

(2) the interests pursued through the litigation must be germane to the association's purpose; and

(3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Defendants claim that plaintiff has failed to meet the first requirement of the representational standing test and therefore may not pursue this action. In this assertion, defendant relies on *National Treasury Emp. Union v. U.S. Department of Treasury*, 25 F.3d 237 (5th Cir.1994) (hereinafter *NTEU* ).

In *NTEU*, the treasury employees union commenced an action on behalf of its members as a result of a Department of Treasury requirement that "public trust" employees and applicants fill out a detailed questionnaire which included questions about drug use. *NTEU*, 25 F.3d at 239. Employees were informed that failure to answer the questionnaire could result in dismissal. *Id.* at 240. The Supreme Court held that the union did not have standing to bring the action because it had failed to show that any represented member had actually suffered any injury as a result of the requirement. Specifically the court stated:

What is particularly troublesome to their assertion of standing, however, is that the plaintiffs also have not even alleged that there is a threat of such injury to any individual member of the association; or stated another way, the plaintiffs have identified no "Jane Doe" member of the NTEU who, if required to fill out question 19 on SF–85–P, would tend to incriminate herself by giving truthful answers. In order to have standing, "[t]he [NTEU] must show [an individual who] 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct, and the threat of injury must be both real and immediate, not conjectural or hypothetical." (citation omitted). Because the NTEU has failed to identify even one individual who would be forced to incriminate himself by truthfully responding to the drug related questions, it is clear to us that the injury alleged is— as far as this suit is concerned—only hypothetical and conjectural.

*Id.* at 242. In light of the Court's holding in *NTEU*, defendants claim that plaintiff does not have representational standing since plaintiff cannot now identify any employee of Illinois Central who is in immediate danger of being subjected to the requirements of § 63–11–8 if involved in a railroad crossing accident. As stated above, this court is persuaded that plaintiff does have representa-

tional standing. Three reasons lead the court to this conclusion.

First, this court is convinced that defendants' reliance upon *NTEU* is misplaced. While the *NTEU* Court did find that the employee union lacked standing to bring a suit on behalf of its employee members, the court's rationale was that the subject employees had no reasonable expectation to keep confidential the information asked by the employer. Furthermore, the court stated that the information asked for on the questionnaire was, if anything, a minimal intrusion into the privacy of the employees which did not amount to an actual injury.

The instant case differs dramatically from *NTEU.* Defendants removed blood from an employee of the plaintiff without his consent. Unlike the questionnaire in *NTEU,* a blood test cannot be characterized as a minimal intrusion.

■ Secondly, defendants erroneously assume that only an employee who exceeded the maximum blood alcohol content allowed by § 63–11–8 and was actually charged with DUI would have standing to challenge the testing provisions of the statute. However, an individual need not be actually arrested and prosecuted in order to challenge a state's statute on constitutional grounds. *See Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974). The detention and physical intrusion upon the train crew are sufficient to satisfy the requirement for individual standing.

Thirdly, the threat of future harm to the plaintiff and its employees is real and immediate. In *Virginia v. American Booksellers Association,* 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) the United States Supreme Court stated:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of the statute is ... a harm that can be realized even without actual prosecution.

In the instant case, the law at issue has not been repealed and there is no indication that law enforcement officers will not interpret and enforce the law as did the Rankin County Sheriff's Office. Additionally, it is common knowledge that railroad crossing collisions are an unfortunate but common fixture in the history of railroads. This court certainly appreciates that train collisions have happened in the past in Mississippi and undoubtedly will happen again. Plaintiff has shown, then, by competent proof that plaintiff's fear that its employees will be subjected to intrusive testing procedures when these accidents do occur meets the requirements of the test set forth by the Supreme Court in *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

### IV. Justiciable Controversy

■ It is fundamental that all actions brought in federal courts, including challenges for injunctive and declaratory relief, must be actual, immediate, concrete cases or controversies under Article III of the United States Constitution. *National Treasury Employees Union v. U.S. Department of Treasury,* 25 F.3d 237, 241 (5th Cir.1994).

The Article III justiciability doctrine, which includes, *inter alia,* the interrelated and overlapping principles of standing, ripeness, mootness, the restriction on advisory opinions, and the prohibition on federal injunctive relief based upon speculation and conjecture, are "designed to confine the federal courts to their proper—and properly limited—role in a democratic society." *National Treasury Employees Union,* 25 F.3d at 240–41; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). This doctrine of justiciability teaches that it is important for the judiciary to avoid ruling upon "important constitutional issues in the abstract," without concrete facts or tangible injury to the complainant, because to do so would "distort" the role of the federal courts and would "open the judiciary to an arguable charge of providing government by injunction" *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974).

■ Where a plaintiff, as in the case sub judice, seeks federal injunctive relief, the matter sought to be litigated must be imminent, non-speculative and present a threat of harm to the plaintiff personally. A narrowly circumscribed exception to this tenet of federal jurisdiction is where an otherwise justiciable issue can appear and disappear before there can be judicial resolution. In such a case, the complainant is not without a remedy.

The Fifth Circuit set forth the exception to the justiciability doctrine in the case of *Valley Const. Co. v. Marsh,* 714 F.2d 26 (5th Cir.1983). In that case, the court recognized that when the controversy at issue no longer exists, there is a presumption of mootness. *Id.* at 28. However, this presumption is overcome if the plaintiff can show that the claim is "capable of repetition, yet evading review." *Id., (citing Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). The Fifth Circuit explained there must be a " 'reasonable expectation' that the plaintiff will be subjected to similar conduct in the future." *Valley Const. Co.,* 714 F.2d at 28 *(citing Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). In addition, as a result of the transience of the claim, the issue must "evade review." *Valley Const. Co.,* 714 F.2d at 28 *(citing Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976).

■ Despite defendants' contentions to the contrary, the instant case satisfies the Fifth Circuit's test for an exception to the mootness doctrine. This is a case where employees of the plaintiff were subjected to an involuntary testing of their blood by law officers enforcing what is alleged to be an unconstitutional law. The employees of plaintiff had not been drinking alcohol and, therefore, were not arrested for violation of Mississippi's DUI law. Defendant argues that because the engineers face no further action, there is no longer an actual controversy to be adjudicated. However, this does not address the fact that an intrusion was made upon these individuals, and vicariously, their employer. This is exactly the situation contemplated by the Fifth Circuit in its exception to the mootness doctrine. The duration of this allegedly unlawful intrusion upon these men was sufficiently short as to evade review while it was an actual controversy. In addition, there is a significant likelihood that, when a train and an automobile collide again in Mississippi, the employees of the railroad will, again, be intruded upon by law officers enforcing this statute. Therefore, this court holds that there is a justiciable controversy under the Fifth Circuit's exception in *Valley.*

### V. Preemption

■ The question defendants raise here is whether Mississippi's Implied Consent Law, § 63–11–1 *et seq.* of the Mississippi Code Annotated, is preempted by the Federal Railroad Safety Act, Title 49 U.S.C. § 20106 and the regulations promulgated pursuant thereto, specifically 49 C.F.R. § 219.

In reaching a determination, this court recognizes the fundamental concept that state laws can be preempted by federal regulations and federal statutes. *Louisiana Public Service Commission v. F.C.C.,* 476 U.S. 355, 368–69 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). The Supreme Court in *Jones v. Rath Packing Co.* held that, "[p]reemption occurs [1] when Congress, in enacting a federal statute, expresses a clear intent to preempt state law; [2] when there is an outright or actual conflict between federal and state law; [3] where compliance with both federal and state law is, in effect, physically impossible; [4] where there is an implicit barrier in the federal law to state regulation; [5] where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law; and [6] where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Id.; Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (when Congress enacts a statute pursuant to its power to regulate interstate commerce, it may preempt state laws regarding the same subject matter by stating so in express terms); *Hillsborough County v. Automated Medical Laboratories,*

*Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (in the absence of express terms, preemption may be inferred "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation."); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (preemption of a whole field will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.")

■ In determining whether a state law has been preempted by federal laws and/or regulations, courts ask the critical question whether Congress intended the federal regulations to supersede state law. *Louisiana Public Service Commission,* 106 S.Ct. at 1899. Asking that question here, this court first compares the Mississippi law at issue with the existing federal regulations and then applies the judicial principles of preemption.

### VI. The Mississippi Statute

The Mississippi Implied Consent Law requires any individual who operates a motor vehicle upon the public highways, public roads and streets of Mississippi to submit to a chemical test of his breath, blood or urine for the purpose of determining the presence of any substance which would impair that person's ability to operate a motor vehicle.

Under § 63–11–30 of the Mississippi Code Annotated:

(1) It is unlawful for any person to drive or otherwise operate a vehicle within this state who (a) is under the influence of intoxicating liquor; (b) is under the influence of any other substance which has impaired such person's ability to operate a motor vehicle; (c) has ten one-hundredths percent (.10%) or more for persons who are above the legal age to purchase alcoholic beverages under state law, or eight one-hundredths percent (.08%) or more for persons who are below the legal age to purchase alcoholic beverages under state law, in the person's blood based upon grams of alcohol per one hundred (100) milliliters of blood or grams of alcohol per two hundred ten (210) liters of breath as shown by a chemical analysis of such person's breath, blood or urine administered as authorized by this chapter; (d) is under the influence of any drug or controlled substance, the possession of which is unlawful under the Mississippi Controlled Substances Law; or (e) has an alcohol concentration of four one-hundredths percent (.04%) or more, based upon grams of alcohol per one hundred (100) milliliters of blood or grams of alcohol per two hundred ten liters of breath as shown by a chemical analysis of such person's blood, breath or urine, administered as authorized by this chapter for persons operating a commercial motor vehicle.

Pursuant to § 63–11–5 of the Mississippi Code Annotated, any law enforcement officer who has "reasonable grounds and probable cause to believe that the person was driving or had under his actual physical control a motor vehicle upon the public streets or highways of" Mississippi "while under the influence of intoxicating liquor or any other substance which had impaired such person's ability to operate a motor vehicle," in violation of § 63–11–30, shall administer a test to detect said substance. Further, pursuant to § 63–11–8, in the event a motor vehicle driver is involved in a motor vehicle accident resulting in death, an investigating law enforcement officer is required to administer a drug and/or alcohol test, [apparently] with or without probable cause.

Defendants claim, and plaintiff agrees, that Mississippi's Implied Consent Law is a criminal statute targeted at individuals who operate motor vehicles while under the influence of alcohol or a controlled substance. Plaintiff argues, however, that the Federal Railroad Safety Act, Title 49 U.S.C. § 20106 and the regulations promulgated pursuant thereto, specifically Title 49 C.F.R. § 219, subsume the law regarding the use of alcohol and drugs by railroad employees, and therefore, preempt Mississippi's Implied Consent Law.

### VII. The History of Railroad Legislation

Railroads have been the subject of comprehensive federal regulation for well over a

century. *See United Transportation Union v. Long Island Railroad Company,* 455 U.S. 678, 687, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982). "Perhaps no industry has a longer history of pervasive federal regulation than the railroad industry." *Consolidated Rail Corporation v. Metro–North Commuter Railroad,* 638 F.Supp. 350, 357 (Sp.Ct. R.R.R.A.1986).

The earliest federal legislation regarding interstate railroads is the Pacific Railroad Act of 1862, 12 State. 489, which granted rights of way through public land so that a transcontinental rail system could be established. In 1887, Congress enacted the Interstate Commerce Act, 24 Stat. 379, which established the Interstate Commerce Commission to comprehensively regulate rail shipping in interstate commerce. In 1893, Congress began enacting a series of Acts known collectively as the Safety Appliance and Boiler Inspection Act, 45 U.S.C. § 1–43(a) which requires safety equipment for railroads used in Interstate Commerce.

In the twentieth century, Congress continued to exercise its power in the area of railroad matters. In 1907, Congress enacted the House of Service Act, 45 U.S.C. § 61–64(b), to promote safety by limiting the hours various types of railroad employees could work consecutively. In 1916, Congress enacted the Adamson Act, 45 U.S.C. § 65–66, mandating the eight-hour day as the standard in the railroad industry. In 1926, Congress enacted the Railway Labor Act, 45 U.S.C. § 161–188, which imposes a duty on rail carriers and their employees to reach "agreements concerning rates of pay, rules, and working condition[s]" and creates mandatory grievance resolution procedures. Then in 1970, Congress enacted the Federal Railroad Safety Act, Title 49 U.S.C. § 20101 *et seq.,* which is the subject of the instant lawsuit.

### VIII. The Federal Railroad Safety Act

The stated purpose of the Federal Railroad Safety Act of 1970 (hereinafter "FRSA") is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." Title 49 U.S.C. § 20101. To this end, the Act assigns overall responsibility for prescribing rules governing matters of railroad safety to the Secretary of Transportation. Title 49 U.S.C. § 20103. Furthermore, to ensure national uniformity of all laws and standards relating to railroad safety, the FRSA includes a broad preemption provision excluding the states from legislating in any area of railroad safety already covered by the regulations adopted by the secretary. Title 49 U.S.C. § 20106. Specifically, § 20106 states:

Laws, regulations and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation or order related to railroad safety when the law, regulation, or order

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

In 1985, finding a dramatic increase in train accidents involving drugs and alcohol as a contributing factor, the Federal Railroad Administration (hereinafter FRA) promulgated regulations prohibiting covered employees from reporting to work while under the influence of alcohol or any controlled substance, Title 49 C.F.R. §§ 219.101 and 219.102, so as to "prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol and drugs." *See* Title 49 C.F.R. § 219.1 *et seq.* Accordingly, the regulations require covered employees to submit to blood and urine tests in the event of (1) any major train accident that involves a fatality or the release of hazardous material lading from railroad equipment which is accompanied by an evacuation or a reportable injury or $1,000,000 worth of damage to railroad property; (2) an impact accident resulting in a reportable injury or damage to railroad property of $150,000 or more; (3) any train accident that involves a fatality to any

on-duty railroad employee; and (4) a reportable injury to any person in a train accident involving a passenger train. Title 49 U.S.C. § 219. 201(a)(1)(2)(3)(4). In certain circumstances, however, the testing requirements set forth above are excepted. *See* Title 29 C.F.R. 219.201(b).

Specifically excluded from mandatory testing is a collision between railroad rolling stock and a motor vehicle or other highway conveyance at a rail/highway grade crossing. *Id.* The FRA concluded that testing railroad employees for alcohol and drugs after a rail/highway grade crossing accident, even if limited to those accidents involving fatalities, "would be costly and relatively unproductive." *See* 50 Fed Reg. 31543. The FRA explained its rationale in the preamble to the final rule, as follows:

Section 219.201(b) excepts rail/highway grade crossing accidents from the requirement for [drug and alcohol] testing. FRA has carefully considered the suggestion that at least those grade crossing accidents that involve fatalities be subject to testing. However, FRA has concluded that such a course would be costly and relatively unproductive. The total number of fatalities in grade crossing accidents has been cut in half over the past decade through better protection of crossings, grade separations, and educational campaigns. But there are still almost 4000 collisions each year between trains and motor vehicles at rail/highway crossings that result in one or more fatalities and roughly 40 events that involve fatalities and pedestrians. A significant number of the train/vehicle collisions (almost one quarter) actually involve the motor vehicle driving into the side of the train, an accident modality that may be confirmed only after investigation and that virtually never would involve fault on the part of the train or engine crew. In the vast majority of the remaining accidents, the crew of the train has little or no chance to avoid the impact because of the very long stopping distances involved and the fact it is the motorist (or pedestrian) who has placed himself or herself in a position of danger.

FRA recognizes that the acts and omissions of engine crews and train crews may at times contribute to grade crossing accidents to some extent. However, in the vast majority of cases, railroad employees can only be viewed as additional victims of these tragedies, since they have no real opportunity to avoid them. Measures directed at the reduction of alcohol and drug use in railroad operations will, of course, tend to reduce the possibility that employee performance at grade crossings may be impaired. In FRA's judgment, no compelling case has been made for the major expansion in the post-accident testing program that would be required if rail/highway grade crossing accidents were to be included.

In addition, under Subpart D of regulations (Title 49 C.F.R. §§ 219.300 and 219.301) the railroads will have discretion to conduct breath and urine tests after rail/highway grade crossing accidents where there is a reasonable suspicion that the employee is impaired or that the employee's conduct contributed to the occurrence or severity of the accident.

50 Fed.Reg. 21543 (Aug. 2, 1985). *See also* Title 49 C.F.R. §§ 219.300 and 219.301.

Defendants attack plaintiff's preemption argument, recognizing that preemption lies only "if the federal regulations substantially subsume the subject matter of the state law," *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). Defendants argue that the federal regulations regarding the use of alcohol and drugs by railroad employees is not subsumed by the FRA regulations because the tests authorized by said regulations are administrative in nature and, unlike the state law at issue, do not provide criminal sanctions.

In support of their contention, defendants rely on Title 49 C.F.R. § 219.13(b). Title 49 C.F.R. § 219.13 states in its entirety the following:

(a) Under section 205 of the Federal Railroad Safety Act of 1970 (45 U.S.C. 434), issuance of these regulations preempts any State law, rule, regulation, order or standard covering the same subject matter,

except a provision directed at a local hazard that is consistent with this part and that does impose an undue burden on interstate commerce

(b) FRA does not intend by issuance of these regulations to preempt provisions of State criminal law that impose sanctions for reckless conduct that leads to actual loss of life, injury or damage to property, whether such provisions apply specifically to railroad employees or generally to the public at large.

The wording of Title 49 C.F.R. § 219.13(b) is clearly destructive to plaintiff's argument. FRA's explanation of the purpose and scope of paragraph (b) of Title 49 C.F.R. § 219.13 undermines plaintiff's argument even more:

> While this part, taken with railroad industry rules and other Federal requirements, makes out a unified program for the civil regulation of alcohol and drug use in railroad operations, it is not an adequate substitute for criminal prosecution in a situation where mens tea and harm to the public safety or health correspond. This statement is intended to make clear the intent of the FRA that the existence of Federal Regulations does not create [sic] a defense in a prosecution of a railroad employee whose conduct produces actual harm in violation of statutes derived from, or modeled upon traditional common law crimes such as manslaughter.

> FRA believes that the preemptive effect of this part will advance, rather than impede the accomplishment of State objectives. Although several states do presently have a statute that addresses the job-related use of alcohol or drugs by railroad employees, those statutes have only rarely been enforced. The greatest capability for enforcement of anti-drinking and drugging rules lies with the railroads, who employ supervisory forces (and railroad police or special agents), and their employees. Both rail managers and employees have strong personal and economic incentives to avoid the loss of life and property that alcohol and drugs can cause. These rules will both strengthen the resolve of the railroads to address this problem and provide

important new information and tools not previously available.

50 F.R. 31508–01, 31532 (Aug 2, 1985).

This court agrees with the defendant that Title 49 C.F.R. § 219.13 and the aforementioned wording of the preamble to the FRA, along with the jurisprudence addressing preemption, readily show that Mississippi's Implied Consent Law, criminal in nature, is not preempted by the Federal Railroad Safety Act.

### IX. Supplemental Jurisdiction

Having disposed of the federal question regarding preemption, this court is left with plaintiff's state law claim that a definition of "motor vehicle" under the statute does not include trains. This court recognizes that it is not compelled to rule on this issue of state law, having resolved all federal questions under Title 28 U.S.C. § 1331. Indeed, the court is imbued with discretion to address the state law claim under Title 28 U.S.C. § 1367(a) and (c) which provide:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.

This court, having original jurisdiction over the preemption claims, as well as questions of state law arising under the same case and controversy, finds that there is no compelling reason not to rule at this time regarding the interpretation of the term "motor vehicle" as it is used in Miss.Code Ann. § 63–11–8.

■ In interpreting this state statute, the court is mindful of the precepts in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which counsel this court to apply the law of the State of Mississippi. Despite the fact that the basis of this lawsuit does not have its foundations in diversity jurisdiction under § 1332[9], this court sits as a state court on a state matter and will apply state law under the guidance of *Erie. Id.*

Miss.Code Ann. § 63–11–8 states in pertinent part:

(1) The operator of **any motor vehicle** involved in an accident that results in a death shall be tested for the purpose of determining the alcohol content or drug content of such operator's blood, breath or urine.

(2) If any investigating law enforcement officer has reasonable grounds to believe that a person is the operator of a **motor vehicle** involved in an accident that has resulted in a death, it shall be such officer's duty to see that a chemical test is administered as required by this section.

In the instant case, a deputy with the Rankin County Sheriff's Department in Rankin County, Mississippi, was persuaded that under this statute he was required to subject engineers operating a locomotive involved in a fatal collision at a train crossing to a chemical test. In reaching his conclusion, the deputy necessarily determined that the train should be considered a "motor vehicle" within the meaning of this statute. Standing behind its officer, the State of Mississippi also offers this construction of the term "motor vehicle." However, this court is compelled to disagree.

■ Mississippi law on statutory construction is well settled. *Mississippi Power Co. v. Jones,* 369 So.2d 1381, 1388 (Miss. 1979). The first determination to be made is whether a statute is ambiguous. *Id.* If the court finds the statute unambiguous, then it should be interpreted according to its plain meaning. *Id.* Regardless of the statute's ambiguity, however, the goal of a court in its interpretation of a statute "is to discern and give effect to legislative intent." *Anderson v. Lambert,* 494 So.2d 370, 372 (Miss.1986). "Popular words in statutes must be accepted in their popular sense and we must attempt to glean from the statutes the legislative intent." *Chandler v. City of Jackson Civil Service Comm.,* 687 So.2d 142, 144 (Miss. 1997) (*citing Miss. Power Co.,* 369 So.2d at 1388). "Where the language used by the legislature in a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation." *Chandler,* 687 So.2d at 144 (*citing Marx v. Broom,* 632 So.2d 1315, 1318 (Miss.1994); *City of Natchez v. Sullivan,* 612 So.2d 1087, 1089 (Miss. 1992)).

This court determines that the term "motor vehicle," taken in the context of the Mississippi Implied Consent statute, Miss.Code Ann. § 63–11–1 et seq., is not ambiguous and the plain meaning of the term "motor vehicle" applies.

The term "motor vehicle" is mentioned numerous times in the Implied Consent Statute. Miss.Code Ann. § 63–11–5, § 63–11–7, § 63–11–21. Each time, the legislature refers to a motor vehicle as one being driven "upon the public highways, public roads, and streets of this state." *Id.* This construction of the term "motor vehicle" necessarily excludes any vehicle driven exclusively on rails. In addition, the Implied Consent statute, by reference, incorporates sections of Corpus Juris Secundum into the interpretation of the statute. Miss.Code Ann. § 63–11–1 (*referencing* 61A C.J.S. Motor Vehicle § 625(1) et seq.). This section makes reference to the definition of "motor vehicle" in 60 C.J.S. Motor Vehicle § 1, as follows: "The term 'motor vehicle' ordinarily means a vehicle which is

---

**9.** Title 28 U.S.C. § 1332 states in pertinent part: "The district courts shall have original jurisdiction of all civil actions where the matter in con- troversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States...."

self-propelled, a vehicle operated by a power developed within itself and used for the purpose of carrying passengers or materials, and generally includes all vehicles propelled by any power other than muscular power, **except traction engines and such motor vehicles as run only upon rails or tracks.**" (emphasis added).

Section 63–11–21 of the Implied Consent statute provides penalties for one's failure to submit to a chemical test for the purpose of determining blood alcohol content. The statute provides in pertinent part that once the driver has refused a chemical test, "the officer shall at that point demand the driver's license of the person, who shall deliver his driver's license into the hands of the officer." *Id.* A reading of the plain language of this remedial measure clearly excludes train engineers in that they do not rely on a "driver's license" to operate locomotives.

█ Finally, the Mississippi Supreme Court has recognized that the driver's license suspension provisions of the Implied Consent law are criminal in nature in that they punish violators for failing to submit to chemical testing. *State v. Martin,* 495 So.2d 501 (Miss.1986). The Court stated, "... we regard any statute for suspension or revocation of driving privileges as penal in nature and effect." *Id.* at 502. Laws which are criminal, rather than civil, require a strict interpretation of their plain language against the state. *McLamb v. State,* 456 So.2d 743 (Miss.1984); *State v. Russell,* 358 So.2d 409 (Miss.1978); *Carter v. State,* 334 So.2d 376 (Miss.1976); *Walton v. State,* 219 Miss. 72, 68 So.2d 87 (1953). Applying a strict interpretation of the plain language of § 63–11–8, the court gives great weight to the common usage of the term "motor vehicle" as defined in Corpus Juris Secundum and incorporated into the statute by reference, Miss.Code Ann. § 63–11–1 (*referencing* 61A C.J.S. Motor Vehicle § 625(1) et seq.); the neighboring statutes which require the "motor vehicle" be driven on "public highways, public roads, and streets," Miss.Code Ann. § 63–11–5, § 63–11–7, § 63–11–21; and the failure of the statute to specifically include trains in the definition of "motor vehicle," § 63–11–1 et seq.

If the legislature had intended train engineers to be subject to the punitive measures of § 63–11–8, the Mississippi legislature could have stated so specifically. In addition, the legislature would have provided remedial measures which apply more logically to trains and their engineers. Surely, the Mississippi legislature never intended the remedial driving course, § 63–11–32, and the impounding of the driver's vehicle, § 63–11–49, to apply to locomotive engineers.

Therefore, after weighing the aforementioned considerations, this court *Erie* guesses that the Mississippi Supreme Court, if faced with the question, would hold that vehicles which operate exclusively upon rails are not included within the plain meaning of the term "motor vehicle," and are thus excluded from the grasp of Miss.Code Ann. § 63–11–1 et seq.

### X. Conclusion

The court holds, based on the foregoing reasons, that the Eleventh Amendment is no bar to plaintiffs suit, that plaintiff has standing to sue in a representative capacity, and that this lawsuit presents a justiciable controversy before the court. The court further holds that Mississippi's Implied Consent Law is not preempted by the Federal Railroad Safety Act. Finally, exercising its supplemental jurisdiction, this court holds that the term "motor vehicle," as used in § 63–11–8 of the Miss.Code Ann., does not include trains.

In so holding, this court grants plaintiff's motion for summary judgment on its claim for declaratory and injunctive relief and hereby enjoins defendants from applying Mississippi's Implied Consent Law to the railroads. Defendant's motion to dismiss, of course, must be denied.